We'll begin right away with the first case on the calendar, which is number 20-3909, Federal Republic of Nigeria v. VR Advisory, Ltd. Can you all hear me all right? Is this working okay? Okay. Thank you. Thank you. Good morning, Your Honors. Good morning. May it please the Court. I'm Alexander Penku here representing the applicant appellants, Federal Republic of Nigeria, and the Federal Republic of Nigeria's Attorney General, the Honorable Abolkar Malami. I'm sorry. Would you please say your last name again? Penku. P-E-N-C-U. Very good. Thank you. Penku. Your Honors, the District Court committed reversible error by engrafting an extra statutory barrier to the Federal Republic of Nigeria's right to proceed directly via Section 1782, discovery and aid of its criminal investigations. The starting point for any analysis is the treaty itself, Article 19, explicitly preserved for the contracting parties. The contracting parties here were the United States and Nigeria to avail themselves of any available international convention or domestic laws of the contracting parties. One of the domestic laws of the contracting parties is obviously Section 1782. This circuit and the Supreme Court has held that statutes and treaties are held on the same footing, so we have to look to see whether there's a conflict between the treaty and the statute, and there is none. If you go through the amendments from 1782, none are in conflict with the Nigeria MLA. For example, a foreign sovereign has been held to be an interested party under 1782. And— Can I interrupt? I mean, I guess the threshold question is, is there still a proceeding taking place in Nigeria? There are proceedings. Proceedings. I mean, there are investigations. There have been convictions. So there are no criminal proceedings that are still pending. PNID have been convicted. There are proceedings in terms of the—within the definition of the statute that there are still ongoing criminal investigations regarding Federal Republic of Nigeria public officials and PNID affiliates, because it's not just PNID. PNID had many, many affiliates, offshore entities, that were engaged in the payment of bribes. So there are still ongoing pending Nigerian proceedings. Because Judge Engelmeyer seemed to think that there was some funny business going on here. Right. That this was all subterfuge. It was all designed really to get evidence that could be used in London. And so an awful lot of ink gets spilled on what's going on in London. But it seems to me that the request really is about the fact that there are proceedings in Nigeria. And there's no statute of limitations in Nigeria? Well, the position in Nigeria is that the enforcement is part of the fraud. It's ongoing. And that's really where the district court made a profound mistake by not understanding the nature of the discovery requests. Nigeria's investigating not just the procurement of the GSPA award and the conduct of the parties in the arbitration, where Nigeria basically didn't mount a defense, but the actual enforcement of the award itself. And that's what the discovery was targeted at. Because Nigeria has uncovered in its investigations bribe payments made post-stating the award, the arbitral award. So the discovery was for the Nigerian proceedings, not for the English proceedings. And that... Well, I mean, look, it seems to me that an MLAT, the difference between an MLAT, and this MLAT in particular, and 1782, is that the latter has to be tethered to proceedings, right? And there's no adjudication, either now or contemplated, right? No, not for 1782. I mean, the 96th Amendment allowed 1782 to be used for criminal investigations before formal accusation. And so that's our point, that the district court made an error of law by basically imposing an exhaustion requirement or a barrier, if you want to call it an extra statutory barrier, when 1782 is available for criminal investigations overseas. And I think... Thank you. Excuse me. I'm just curious as to why so much effort is expended on somehow avoiding any assumption that this evidence could be used in the London proceedings. Is there some reason why it was not requested for that? Because I understand there's an argument on the other side, but I'm puzzled by it as to why a trial in a court in London that aims to undo for fraud an arbitral award is not a proceeding of the sort that 1782 contemplates. I'm also puzzled as to why it matters whether information that is sought for Nigerian proceedings, and assuming that it's appropriately sought, couldn't be used in another proceeding. We've got a case that says exactly that, that that's appropriate. So why are we all shying away from what's going on in London? Well, first of all, we're not shying away from it at all, and Your Honor is absolutely spot on correct. And we took that position at the very outset in the original 1782 application before Judge Schofield. From the very beginning, when we filed that 1782 application, P&ID intervened, even though it was no longer a party to the Nigerian proceedings, or it responded to that initial 1782 application. P&ID came in, they sought two points of relief, one, to be named an interested party, right, to get copies of the documents, and, two, a use restriction. The judge didn't give them a use restriction. They tried three times and failed to get a use restriction. And you said in your brief you reserved the right to use the material in that proceeding if that were came up. From the very outset, Nigeria was very clear, and that's in the record, A271 to A277, that it preserved the right to use any evidence in the Chief Law Enforcement Officer's discretion in foreign proceedings in keeping with the three acts of the like. But the actual request that was before Judge Engelmeyer was tied to the Nigerian criminal proceedings and not to the U.K. civil proceedings. That is correct, except that we, at that point, it came a little later in time than the original 1782, and we referenced and acknowledged, including at the hearing, that some of the evidence might be used in England. And just to put everything in context, what we're talking about here, and this is in the record as well, and it's A349, paragraph 124, everything that was uncovered in New York, there were two bank records. Two bank records that were actually used in England from the hundreds and hundreds and hundreds of bank transactions that were used in Nigeria in the mountain of evidence that was uncovered. So the focal point has always been the Nigerian proceedings. We have an attorney general that is trying to investigate deep-rooted corruption that goes pretty systemic in that direction. And just a further follow-up, in part on Judge Sullivan's question, in part on what you just said. You said, in what you're calling the original 1782, which was against, to get information from banks, that's a wholly different request than this one, that there was a mountain of evidence that was used in Nigeria. And in response to Judge Sullivan's questions, you said that there are ongoing criminal proceedings in Nigeria. That was a present-tense question, I guess. Obviously, there can't be anything in the record before the district court about what is happening today in Nigeria. With respect to what was used in Nigeria, is there some record of that as opposed to what was obtained for use? Because I would take it that a lot of these proceedings, I don't know whether they have grand juries, but I imagine that an investigation is, at least to some degree, confidential. So do we have any place we could look to verify what you just said about all of this information was used in some proceeding? Was it used in a public proceeding? Is there anything in the record of this case that describes that use? The only public, to my knowledge, the only public records are the convictions where there were actually criminal actions commenced. Those are in the record. And then, in addition, the ongoing investigations by the EFCC agency, which, yes, it's in the record, but it's obviously dated six months past, but where information and documents not only from offshore jurisdictions in England and Nigeria, but like I said, the two bank records from New York were used. And they were used, frankly, effectively, because the witnesses in Nigeria denied receiving bribe payments. And so the two bank records that came out of New York were documented bribes to the daughter of the chief legal officer who signed off on this multibillion dollar gas contract. She denied receiving any bribes. And then, because of 1782, it worked precisely as the courts and Congress intended it to. The documents were used for a foreign criminal investigation, and a small, extremely minuscule subset of documents were then used by the attorney general in his discretion to try to now go ahead and set aside this fraudulent arbitral award. It's completely permissible, particularly when Nigeria was upfront about it, about their rights to preserve their right to use these documents in foreign proceedings. Well, as I'm sure we'll hear from the other side, it was also said in that brief that it was rank speculation that these documents were being sought for use in England. Am I right that you would respond that this is, it is speculation that that was the underlying motive or that the Nigerian request was a pretext, or the request for use in Nigeria was a pretext? You would say that's speculation, and you would say that's false. I would give an even more direct answer to that factually, which is that one singular sentence that the district court seized on at the VR Respondent's brief, an argument, doesn't hold up. And if 8271 to 8277 makes it clear, the rank speculation referred to PNID's first set of requests for relief, which is that it be granted interested party status in the original 1782 application. We opposed that because we said, first of all, we're investigating PNID for conspiracy and collusion with Federal Republic of Nigeria government officials and former government officials. We don't think PNID should have access to everything that's going into a criminal investigation in Nigeria. They were no longer a party in Nigeria. They had already been convicted. They weren't appealing, and they weren't one of the 10 respondents. So PNID came back and said, wait, but we are Nigeria's adversary in England. And what we said is, we don't know what we're getting yet out of the clearing banks here in New York. We know what we obtained out of Nigeria and England and other jurisdictions. But at the time that the subpoenas were proposed for discovery, Nigeria did not yet know what it was going to get out of New York. So what we argued is, if and when we get responsive documents and the attorney general who's leading this investigation determines that they're relevant for use in England, PNID can get those through the normal disclosure practices in England because they have discovery rules there as well. And there, they can get and exchange those documents. Now Judge Schofield disagreed with us, granted them interested party status, and they got copies of everything that we obtained out of New York. And as I said, there were hundreds of bank transactions that were obtained. Two of them were the ones that were used in England in keeping with In Reacts and Delight. PNID tried to stop us from, tried to stop Nigeria from using them, and they failed. And I'll just, just to show the reaction. They tried to stop, I don't know what they tried to do in England, but you're referring to they came back to Judge Schofield and said, stop this because this isn't what they asked for, and she evidently was not bothered by that. That's right. Not only did she not grant PNID the relief it was seeking, but the very next day after the hearing, it granted J.P. Morgan a protective order. So J.P. Morgan knew to go ahead and seek, just the way the Federal Rules contemplate and require, a protective order restricting use of the documents produced to certain set of proceedings. The very next day after PNID, on the third go around, tried to get a use restriction, they were denied. J.P. Morgan was granted a protective order, which, which limited the use of the bank records to the Nigerian proceedings and any other proceedings in England, anywhere else relating to the enforcement, vacatur, set-aside proceedings, anything dealing with the GSPA award, which was clearly aware of the Second Circuit precedent that foreign sovereigns or any other parties may use and deploy evidence that was lawfully obtained, as it was here, in other subsequent foreign proceedings. And it makes sense. After all, yes, there's a criminal investigation in Nigeria, but this country is trying to defend and set aside a massive fraud here, $10 billion. I understood. Mr. Pencrew, can I ask a question, with your permission, Judge Kearney? I'm just, I'm trying, I want to go back to something I asked before. What is the daylight, as you see it, between the MLAT and 1782? In your view, is there nothing extra you get with an MLAT that you don't get with 1782? Not at all. Thank you for that question. No. I think the law is very clear, and interpreting 1782 with its twin names, and just generally speaking, the MLAT is not a proof-gathering restriction, it's the opposite. It actually helps both the United States and foreign governments be able to retrieve evidence. They're used in tandem together, and MLAT will definitely, by far, give much broader information and assistance than a section 1782. Doesn't the MLAT also place on the government receiving the request the duty, the obligation to produce people in custody, for example? That's right. And to take other affirmative acts with regard to restitution, forfeiture, and so on, that would not be available under 1782, traditionally? Precisely. Precisely. And this is the whole point that Nigeria was trying to make. Under the MLAT, you could get a search warrant. You could request the American authorities to seek a warrant to do a search pursuant to the Fourth Amendment in the United States for relevant evidence. I take it that could not be obtained under 1782? That is absolutely correct, and that's really the heart of the matter, which is that the Chief Law Enforcement Officer for the Federal Republic of Nigeria traded the ability to pretty much get automatic assistance from the Department of Justice via the MLAT because those treaties are automatic in their responsibilities and their obligations to help one another unless the request falls within a very narrow exception, which don't apply here, the four exceptions that we briefed in our papers. But what the Attorney General did is speed was more important for him to go ahead and get what are historical documents that could be obtained from 1782. So in a case like this, and with very sensitive investigations concerning minister-level corruption, speed was more important for Nigeria. Can I interrupt you, though? Because a lot of the speed arguments really weren't made in front of Judge Engelmeyer, were they? Well, they were made at the motion of vacant hearing because in the briefs, what we argued was what Judge Lynch alluded to earlier, which is there is no prohibition on Nigeria going first with the MLAT. So we argued that Nigeria had a right to proceed directly through 1782. And then Judge Engelmeyer flipped the burden on us and asked us why we would forego the MLAT, and actually stated that he could conceive of no reason why a foreign prosecutor would forego the MLAT. And we said speed, because speed here in a case that's very document-heavy, just following the money, that was a better recourse for Nigeria. And there's nothing in the law, statutory, treaty-wise, case law precedent, that required Nigeria to first exhaust its options via the MLAT. The question about what the MLAT provides is a great one, because they work beautifully together in tandem. They're not inconsistent. They're consistent. A foreign prosecutor has the option of choosing the MLAT for a wide menu of options, wiretaps, search and seizure orders, various things. But for limited documentary evidence and occasionally deponent, 1782 is available. And I think the part that makes it crystal clear is the 2009 enactment of 18 U.S.C. 3512. So there we go. We're talking about the MLAT process. The MLAT process now has a statute where foreign prosecutors can channel their requests into a centralized office in Washington at the DOJ, the Office of International Affairs, and an assistant U.S. attorney will go ahead and take a 1782 application for documents via subpoena. A foreign prosecutor has that option if he or she chooses to go that route. But very interestingly, Congress made very clear that 1782 is still available for a direct application by a foreign prosecutor. You know, whether it's speedier or not may depend on what 600, 800, whatever there are. United States district judges choose to do with it. By the same token, the MLAT process depends to some extent on the bureaucracy of the Department of Justice cranking up in an appropriate way. I'm not sure what I would think about what's faster. I suppose foreign governments have experience with each and can make their own decisions. But I just wonder, why are we second-guessing this? If the treaty says you don't, there's no exhaustion requirement. If the treaty says this is supplementary and it doesn't interfere with any other means of getting the same evidence by some other source under the domestic law of either country, that's good. So, I don't know why it would be appropriate for a district judge to assess whether you made a good tactical choice or not in using this rather than that. And Your Honor, you're absolutely correct, and that goes in line with the U.S. Supreme Court precedent for quite a long time. I think we're going back 40 years in Patsy. Mr. Penku, why don't you wrap up here? I think we've kept you well past your time, and I'm going to give Mr. Rosenbaum an additional 10 minutes as well. Okay. You've reserved several minutes for rebuttal, then, okay? Thank you very much. Thank you. Please give Mr. Rosenbaum an additional 10 minutes. Thank you, Your Honor. Thank you. And good morning, Your Honors. It's very nice to be here in person. Finally, may it please the Court, Zachary Rosenbaum of Coburn and Kim for the respondents joined by my colleague, Darrell Stein. I'll start with something that seemed to be lost in the eloquent argument I just heard, which is that the petitioner, in this case, is the master of his or her own petition. And in this case, the petition that was brought to the district court and the appeal that's brought to this court is centered solely and singularly on a Nigerian criminal proceeding. So actually, I'm going to interrupt for a minute because I've been keeping quiet here. I'm burning to know, though, on what authority you point to as requiring your opponent to go through the MLAT as opposed to the 1782. We have, as Judge Lynch has pointed out, in the MLAT itself, the explicit preservation of alternative proceedings. There's nothing that I can see in the record that places an obligation on interested persons of foreign governments, on anyone, to begin with an MLAT proceeding or request in a criminal proceeding. And the district court relied so heavily on that presumption that this was circumvention that I'm very interested to know what you point to as the authority expressing the United States policy requiring foreign governments to use the MLAT in place of 1782 and enabling the district court to make a circumvention finding that is, you know, fatal to this application based on its decision to use 1782 instead. What can you point me to? So first, well, I'll start with Intel because in this case, it was not that the court created a barrier, a fixed barrier. The court found that it could consider. Well, no, I would like you to point to, is there any authority that you are aware of that expresses the United States policy requiring foreign governments in criminal investigations to use the MLAT proceeding before going to 1782 or maybe in place of 1782? There are now several district court cases that find that the failure to go through an MLAT is a consideration among the Intel faculty. Most of them cite Judge Engelmeyer. No, Your Honor, respectfully, there was one prior to Judge Engelmeyer and then I think there are two or three subsequent, which rely on his decision. And none of that, of course, is binding on us. No, absolutely. Is there any authority that is binding on us? Is there anything in a statute, a treaty, a decision of the Supreme Court, a decision of this Court of Appeals, or even a decision of a sister circuit that you are relying on? Not directly, Your Honor. Not directly for that point. What we are suggesting and what Judge Engelmeyer found, and I'll quote him, is to be sure there is no principle of law compelling a foreign nation seeking evidence in this country for use in a criminal proceeding to proceed via the MLAT. So Judge Engelmeyer acknowledged that, but found that he could consider why. Why would it be the case that this would even be a negative factor that a district court could consider in its discretion, that the requesting party could do something else? Why would that be a consideration that would argue against using Section 1782? I think there's a textual argument, and then there's a pragmatic argument. When a foreign prosecutor with an MLAT uses the MLAT, the DOJ goes through a filtering process. And while the DOJ is limited by the MLAT in terms of the narrow conditions that it might be able to deny assistance, it typically has both a contract and a constitutional mandate to make sure that our principles of due process are being protected. And I think under Intel, and I think this resonated with the district court and has resonated with other district courts, that when you strip out that DOJ filter, then it is incumbent on the district court to do the job of DOJ. Perhaps that is so. But if that is so, then isn't the reason or wouldn't the reason have to be a finding that there is some violation of due process or something happening here that is inconsistent with American principles of justice? I understand the point that maybe that's what the DOJ would do. I understand the point that whether or not there is an MLAT, if some country that we did not have a treaty with came and made a request under Section 1782, and the responding party said, wait a minute, this is a dictatorship, they have no real justice system, they're just trying to use this as an excuse to throw people in the gulag or whatever, surely the district court would be entitled to consider that. But is there any finding here? You say there's, Judge Engelmeyer was concerned that there might be funny business. Okay, I'd be concerned too. Did he make a finding that there was funny business? Well, he didn't make a finding that there was funny business. He did make a finding that the statement to Judge Schofield about rank speculation at a minimum undermined seriously the credibility. That's a pretty slim read when in the same brief in which that statement, from which that statement is plucked, Nigeria specifically says we reserve the right if we get this information to use it in the UK. How can that, how can you say that that statement that it's all speculation, which at this point is going to be taken in some complicated context that I admit I don't fully understand, but how can you say that that is, amounts to a representation that we will not use it in the UK when they say they reserve their right to do so? Well, what I would say is that any party before a court, before it labels something rank speculation, should actually consider it to be rank speculation. And if they, just fundamentally based on the sequence, if they came into the U.S. court to gather evidence ostensibly and represented that it was for the Nigerian proceeding, they had an obligation at that point if they intended to use it in a different proceeding to say so. And by the way, by the way, what would be wrong with using it in the UK proceeding? There, under this court's precedent, there wouldn't be anything wrong with using it if you get it in the first place under proper circumstances. Yes, indeed. So I come back to the basic question. I would have no problem with a district court saying, based on the record before me, either there is no criminal investigation going on in Nigeria, that's just a falsehood, if that's what the record supported, or saying there is a proceeding, but it's oppressive. It has nothing to do with due process. It's basically that the criminal investigation is you give the evidence to the dictator and the dictator says, yeah, you're guilty and we're not going to be part of that. If that's the way a district court handled this, that would be, it seems to me, quite within discretion. But what the judge here relied on was essentially a kind of exhaustion requirement. The principal finding of the district court was you had to use the MLAT first and you're circumventing that, and I have trouble how you can possibly reconcile that with Article 19 of the MLAT. I will try, Your Honor, because I think I can. And if you look at the plain language of Article 19, and I've studied it and I've read it, it starts with, assistance and procedure provided by this treaty shall not prevent. And it continues. And I'll tell you what to do. Prevent or restrict. Prevent or restrict. I didn't mean to not read that word, but I want to focus on assistance and procedure provided by this treaty shall not prevent or restrict.  Well, there is a procedure provided by this treaty, and the judge said the very existence of such procedures restricts your ability to use Section 1782. It's a factor that I can consider in my discretion denying you something that, for sake of the argument, we could say is otherwise appropriate because this procedure exists. But the statute says the procedure is provided by this treaty, not just assistance that you actually got. The procedures provided by this treaty shall not restrict a contracting party from granting assistance under any other – I'm not under any, it doesn't say any – under other applicable conventions, arrangements, agreements, practices, or under the laws of the contracting party. How could it be clearer? Well, and again, Your Honor, I read the end as conjunct, assistance and procedure provided past tense, not future tense, under – by this treaty, which suggests to me that what is meant here is that if you obtained assistance through the procedure provided by this treaty, that will not prevent you or restrict you from using other laws. Suppose Nigeria came to the Department of Justice and said there's a safe house in the area, here's your probable cause, go get a search warrant and search that. And the Justice Department did it, and they got the search warrant. Then this proceeding takes place. Would that – I think Article 19 would apply. So wait, so wait. If they had used the MLAT for any other purpose, totally distinct from what they're asking for here, but in part of the same investigation, then you could not say, oh, but you know how to use the MLAT, you know where the address of the Department of Justice is. That's proven by the fact that you used it for the search warrant. No. Why would that be different from this? Well, because if they came and used 1782 for a different purpose, then I think the same logic would apply, that they didn't seek assistance and procedure provided by this treaty for that purpose. I think that if the contracting parties intended this to mean something – Why would you have to use 1782? I'm trying to – I'm having trouble figuring out if there is this exhaustion requirement. Would it be the case, then, that if they had first asked the Department of Justice and the Department of Justice said no for whatever reason, then the fact that they didn't provide the assistance would bar them from – I don't think it would bar them. I – Judge Engelmar did not find that there was an exhaustion requirement, and he did not find that there was any requirement. What he found – all he found in exercising the discretion of the district court was that the – a contracting party's decision not to go through the MLAT process is a factor that can be considered in the discretion of the district court. You are not using the MLAT as a restriction on the ability to use the laws of the United States that otherwise would be applicable. Two reasons. One, for the textual argument I made, which I think assistance and procedure provided by is past tense. But in addition, there – the MLAT country, in this case Nigeria, was in no worse position by having the MLAT than a country that may come in and seek assistance. Because typically what happens most often, particularly with a foreign prosecutor who's coming in to gather evidence in the United States, they go through the Department of Justice through a letter of rogatory or a letter of request. So I think equally as the district court in this case considered Nigeria's decision – Do we have a basis for knowing that? Well, I would like to – When you say that typically – so typically countries that have an MLAT use the MLAT. And typically countries that do not have an MLAT use letters of rogatory. What is the empirical basis for that? Two – two bases, Your Honor. One is in the Department of Justice Judicial Assistance of Foreign Nations guidelines cited at page 27 of our brief in note 10. It – it states, requests for international judicial assistance are executed either on the basis of the treaty obligations assumed by the United States Convention or letters rogatory submitted through diplomatic channels on the basis of international law. That's how you go through the Department of Justice. Correct. What about people who don't go through the Department of Justice? We did not find – we searched high and low. Well, what about Judge Schofield granting the 1782 application vis-a-vis the banks? That – that was an MLAT, right? That was a country with an MLAT. What about the other – the other cases where you say Judge Engelmeyer was followed or anticipated by district courts? Those were countries going via 1782? Correct.  Would we even know about Judge Schofield's decision if we weren't involved in the case? I mean, is there a published opinion? What if – what if a judge just granted one? How would we even know? It is – it is possible. We found – we found the Eastern District of Virginia 2013 decision that was not published where the district court in its discretion denied 1782's discovery on the basis of MLAT and found that to be – to be permitted under the third intel factor. We now have two follow-on district judges. I don't know. I mean, we can't scour every docket in every district court. Assuming that you are right, would the practice – would the fact that other countries for their own tactical or other reasons proceeded via one route, via reason why some other route is unavailable, or at least why the route that other countries choose should be a factor in deciding whether Nigeria should get what it asked for under this statute? No. The question, I think, for this Court is whether, in its discretion, a district court may consider Excuse me. I mean, the district court here says the third intel factor powerfully supports exercising the Court's jurisdiction to deny the instance 1782 application. My reading of the district court's decision was that this was the game changer here. He spent several pages talking about the decision by Nigeria to bypass the ordinary MLAT procedure, and he – whether there are other concerns expressed. It seemed to me that this was the pivotal point in his analysis. What would he point to to put that in a different context? I'm not so sure. Look, it clearly was important to Judge Engelmeyer's analysis. He said so. And he says it strongly disfavors granting or allowing discovery. So, you know, that's in the plain words that the Court used. But he also found, and I think he Well, excuse me, but suppose we found that we disagree, that as a matter of law, it does not strongly disfavor. Wouldn't it be appropriate then, or required even, for us to send it back to Judge Engelmeyer and say, you can exercise your discretion, again, not considering that factor? He did say other things. He said it was unduly burdensome. That was – as I read it, I thought, well, it doesn't sound so terribly burdensome, but neither of the parties have really worked on that before this Court. If the judge were to say, with a full analysis, I'm not going to grant this because it's unduly burdensome, and it could make a reasonable case that that's a good reason to deny it, that would be a different exercise of discretion to be assessed at some other point. But is it not – if we disagree with you, and we disagree with Judge Engelmeyer, that the failure to use the MLAT is a factor that powerfully urges against the favorable exercise of discretion here, don't we have to return it to the district court? Your Honor, I don't think you have to, but I certainly think that might make sense, because there were two factors that Judge Engelmeyer, in fact, found disfavored discovery. One we've talked at length about, which is the third factor. Another is undue burden. Here you have a federal prosecutor – I'm sorry, well, a federal prosecutor from Nigeria coming into the United States using the conventions of civil discovery, subpoenas with 56 sweeping categories of documents. Yeah, and that never happens in a grand jury subpoena. You're talking to some former federal prosecutors at the moment who know what kind of subpoenas they issue. And in attempts to take deposition testimony, so Judge Engelmeyer found that that factor disfavored the granting of discovery. He also found that the first factor, and just to bring back some context here, the respondents are 25 percent owners of the party, the operative party to the criminal English proceeding, but for this purpose, the Nigerian proceeding is most important. And what Judge Engelmeyer found in assessing the first factor, which I think is important for this Court to consider, whether the person from whom discovery is a participant in the foreign proceeding, that here the nature of the requests that were directed to the owner were – and I think counsel mentioned this – historic. It was documents that that owner might only have by virtue of its ownership of the party to the proceeding. And in that sense, again, going back to Kiobel and the non-mechanical application of the intel factor, the court, the district court found that the first intel factor was only nominally satisfied. Ah. Well, I think technically what he said was it counts in favor of the request, but not so much. I don't know if that were made more the focus of litigation, that that would stand up very well either. I mean, PIND has been convicted of fraud in Nigeria, and again, unless we're going to say that the Nigerian proceedings are totally bogus, it would not surprise me if a party that was convicted of fraud did not retain all its documents and was not eager to turn them over in a discovery proceeding in a civil case in the United Kingdom. VR, your client, is not tarred with that, as far as I'm aware. They've come here and come to Judge Engelmeyer and used legal process to try to resist these demands, as is their right.  But I'm not sure that the fact that they got these documents, presumably, from a party that, if it retained them and if it was law-abiding, might turn them over in a British proceeding. If I were a prosecutor, I wouldn't be thinking about, oh, I don't have to worry about going after one source of the documents because these crooks are another source that I could go to. But that's all neither here nor there, it seems to me, because that factor counted on their side at the end, if only weakly. The only other factor that counted against them was the burdens of burdensomeness of the proceeding. That was, I think it's fair to say, a little bit under-rationalized by the district court or under-explained by the district court. And we've got one big elephant in the room that stomps all over the Nigerian request because that's the one that Judge Engelmeyer put the primary responsibility on. If that's wrong, again, I'm not saying the judge wouldn't have other good reasons. You know, I guess I'll ask your adversary about this, but I don't think they're even asking us to direct that the discovery be provided. They're asking us to vacate the decision below. Right. Mr. Rosenbaum, we've kept you quite a while. Why don't you just make a closing statement? So in closing, we believe that under the standard of review, with use of discretion, Judge Engelmeyer's decision should be upheld. But if the court believes the third factor was an overstep, I think then the only thing this court can do is remand it, particularly because of the constitutional implications where a foreign prosecutor steps onto U.S. soil to seek evidence in any of the foreign proceedings if that was not addressed by Judge Engelmeyer because the NLAT wasn't used. That has to be part of the next phase of this. Thank you very much. Thank you. Mr. Panku, you've reserved two minutes for rebuttal. Yes, thank you. A few points to respond directly to the VR respondent. Judge Engelmeyer found no bad faith. So there was no funny business implied in or explicit in the decision. That's SPA-12 in the record. Judge Lynch, you are correct that the elephant in the room was the Exhaustion Department, the judicially created policy preference that Nigeria go through the NLAT. And that colored everything else. And there can be no circumvention of a treaty if there aren't explicit terms that prohibited what Nigeria did. There's nothing in the NLAT that prohibited Nigeria from going first directly through 1782. And could you just clarify the last point in the dialogue between me and Mr. Rosenbaum? Are you asking us to rebalance the factors and direct that the district court grant your request? Well, we think the request should be granted. However, Vekator is perfectly fine with Nigeria as well. We're comfortable going back before Judge Engelmeyer on the application. But I don't think the panel has to do that. I think on the strength of the application and the intel factors, all the statutory requirements were met. But it is the district court's discretion. We're not granted the discretion to grant or deny this at the end of the day. We just review whether the exercise of discretion was either based on an error of law, based on a clear error of fact, or outside the range of appropriate decisions. If, you know, if the district court said, well, I'm really relying, okay, fine, you're right, we'll consider that factor. But there are other reasons that equally justify my denying this request. Isn't it up to the district court in the first instance to exercise that discretion free of any error that we might find was made? Only if the record shows that there were other alternative bases potentially for the court to exercise its discretion. Here it's so profound that the discretion was unbridled, as this panel has held in other cases. For example, I think the IKB case, the Brandi Dorn case is pretty appropriate here, where the district court in that case misconstrued the motives behind the applicant and the statutory for use factor, but yet couched the decision in a discretionary basis under Intel. And this court said, whoa, lower courts can't do that. If there was an ability to use discovery under 1782 for use and be deployed with some advantage, you can't now, because you're skeptical about the motives of the applicant, given all the other factors being met, deny it and call it discretion. And frankly, that's what happened here, because the court thought Nigeria should have gone forward under the MLAC. And everything else was very— Right. So is that what you're asking us to do, I think, is the question Judge Lynch is posing? We're asking that this court reverse the district court and allow the 1782 discovery to go forward. Alternatively, of course— We're either vacating and remanding with orders to grant the petition— Yes. —or we are vacating and remanding for the district court to reassess. You'd like the home run, but you'd settle for the double. Absolutely. And I think to make you comfortable with the home run, I think I'd just like to make a couple more points, which is— Wrap up, please. Okay. The fourth factor was not even analyzed. I mean, the VR respondents didn't even analyze why the subpoenas were purportedly overly broad and unduly burdensome. They're 56 in number only because Nigeria took the time to actually identify the Nigerian public officials and the offshore shell entities that were paying the bribes. So you can't do a counting exercise. There are just two core subject matters. One was the due diligence file. To determine the purpose behind that was to see whether there were any communications between PNID and Nigerian officials with respect to any shenanigans on the enforcement side. But isn't that exactly the sort of thing that we have district courts for? And isn't that—just as you said, precisely because there was an elephant in the room that dominated the discussion, these other issues were not fully canvassed. Well, they were by us because in our papers, we laid out exactly why— We are asking us to go back and read the district court papers and figure out what we would have done in the district judge's place. But anyway, I agree. You've asked for that, and we'll decide whether that's the appropriate thing to do. All right. Thank you very much. Thank you both for your arguments. Thank you very much. It was a reserved decision.